

# THE ATTORNEY GENERAL
## OF TEXAS

Gerald C. Mann
~~JOHN BEN SHEPPERD~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Honorable George A. Hight
Chief Accountant
Board of County & District Road Indebtedness
Austin, Texas

Dear Sir:

Opinion No. O-4404
Re: Eligibility of Jefferson County
bond issue of $750,000 proceeds
of which were used in constructing
the Dryden Ferry Bridge, to partici-
pate in County and Road District
Highway Fund.

The facts outlined in your letter of February 7, 1942, are these: under authority of House Bill 9, 4th Called Session, 43rd Legislature, Jefferson County issued bonds in the sum of $750,000 to be used in the construction of a bridge known as the Dryden Ferry Bridge on State Highway No. 87 across the Neches River between Port Arthur and Orange. These bonds were issued in 1935 and their proceeds were immediately used in the construction of the bridge. That section of Highway 87 had been designated in September, 1926.

You request our opinion as to whether such bonds are eligible for participation in the County and Road District Highway Fund under the provisions of House Bill 6, 47th Legislature, 1st Called Session.

House Bill 6 is amendatory of Chapter 13, Acts of the Third Called Session of the 42nd Legislature which was the first of our "Road Bond Assumption" laws, and which was passed in 1932. As amended, the first section of the Act now reads:

"Section 1. It is expressly recognized and declared that all highways now or heretofore constituting a part of the system of State Highways and that all roads not constituting a part of such system, which have been constructed in whole or in part from the proceeds of bonds, warrants, or other evidence of indebtedness issued by counties of the State of Texas, or by defined road districts of the State of Texas, under the laws authorizing the same, have been and are and will continue to be beneficial to the State of Texas at large, and have contributed to the general welfare, settlement, and development of the entire State, and that, by reason of the foregoing, a heavy and undue burden was placed, and still rests, upon the counties and defined road districts and their inhabitants, and both a legal and moral obligation rests upon the State to compensate and reimburse such counties and defined road districts which, as aforesaid, have performed functions resting upon the State, and have paid expen-

ses which were and are properly State expenses, all for the use and benefit of the State, and to the extent provided herein that the State provide funds for the further construction of roads not designated as a part of the State Highway System.

"Having heretofore, by an Act of the Legislature (Chapter 13, Acts of the Third Called Session of the Forty-second Legislature in 1932), taken over, acquired, and purchased the interest and equities of the various counties and defined road districts in and to the high-ways constituting a part of the system of them designat-ed State Highways, it is further declared to be the policy of the State to take over, acquire, purchase, and retain the interest and equities of the various counties and defined road districts in and to the highways, not previously taken over, acquired, and purchased and con-stituting on January 2, 1939, a part of the system of designated State Highways, and to acquire and purchase the interest and equities of the various counties and defined road districts in and to the roads not constitut-ing a part of the system of designated State Highways as of January 2, 1939, and under the provisions of this Act to acquire such interest and equities in such roads here-after tp be constructed with money furnished by the State, and to reimburse said counties and districts there-for, and to provide for the acquisition, establishment, construction, extension and development of the system of designated State Highways of Texas, from some source of income other than the revenues derived from ad valorem taxes, it being expressly provided herein that the State is not assuming, and has not assumed, any obligation for the construction, extension, and development of any of the highways thus acquired and purchased which do not constitute a part of the system of designated State High-ways. And it is hereby determined that the further provisions of this Act constitute fair, just and equit-able compensation, repayment, and reimbursement to said counties and defined districts and for their aid and assistance to the State in the construction of State Highways and for the construction of said roads which are ancillary to, but do not constitute a part of said system of State Highways, and fully discharges the legally implied obligations of the State to compensate, repay, and reimburse the agencies of the State for ex-penses incurred at the instance and solicitation of the State, as well as for expenses incurred for the benefit of the State, and fully discharges the State's legally implied obligation to such counties and defined road districts to provide additional funds for the further construction of roads not designated as a part of the State Highway System."

The first quoted paragraph is common to the original Act and all its amendments. The second quoted paragraph is in substan-tially the same words as was the original law, insofar as its state-ment of the policy of the State is concerned, simply going further, and taking over all such State Highways as were so designated be-tween the date of the original Act and January 2, 1939, and declaring the intent to acquire such highways so designated after January 1, 1939.

House Bill No. 9, Acts 43rd Legislature, Fourth Called Session, authorized the construction of a bridge across the Neches River between Jefferson and Orange Counties by the State Highway Commission. The same law authorized Jefferson County to hold an election for the purpose of voting bonds in the sum of $750,000, the proceeds of such bond issue to be contributed to the Highway Commission to be used in the construction of such bridge. Section 5 of said House Bill 9 reads as follows:

"No loan or grant which may be obtained under the provisions of this Act for the construction of such bridge and the approaches thereto shall be or become a debt against the State of Texas or against the State Highway Commission, but the said bonds which may be voted and issued by Jefferson County under the provisions of this Act shall constitute the debt and obligation solely of said Jefferson County. It is hereby declared to be the Legislative intent that the bonds issued by Jefferson County as provided herein shall not be assumed by or paid off by the Board of County and Road District Bond Indebtedness, or out of any funds used by said Board to retire County and Road District Bonds."

At the time of the passage of House Bill 9, it was necessary that Jefferson County be specially authorized by the Legislature to expend money on the construction of such a bridge because the provisions of Chapter 13, Acts of the 42nd Legislature, Third Called Session, expressly required that all future improvements on State Highways should be under the direct control of the State Highway Department by appropriations out of the State Highway Fund.

It is now contended that House Bill 9 has been repealed and that as a result of such repeal the bond issue of Jefferson County voted in conformity with the provisions of House Bill 9 are eligible for participation in the County and Road District Highway Fund under the provisions of House Bill 6, Acts 47th Legislature, First Called Session. Said House Bill 6 defines "eligible obligations" as:

"Obligations, the proceeds of which were actually expended on State designated highways."

Section 6(a) of said House Bill 6 provides in part as follows:

"Section 6 (a) All bonds, warrants or other evidences of indebtedness heretofore issued by counties or defined road districts of this State which mature on or after January 1, 1953, in so far as amounts of same were issued for and the proceeds have been actually expended in the construction of roads that constituted and comprised a part of the system of designated State Highways on September 17, 1932, or which subsequent to such date and prior to January 2, 1939, have been designated a part of the System of State Highways or any road that heretofore has constituted a part of said System and which has been or may be changed, relocated or abandoned, whether said indebtedness is now evidenced by the obligation originally issued or by refunding obligations or

both, shall be eligible to participate in the distribut on of the moneys coming into said County and Road District Highway Fund, subject to the provisions of this Act; provided, that such indebtedness the proceeds of which have been expended in the construction of roads which have been designated as a part of the State Highway System after September 17, 1932, and prior to January 2, 1939, shall participate in said County and Road District Highway Fund as of the date of the designation of said road as a part of the State system; * * *

" * * *

"All bonds, warrants or other legal evidences of indebtedness outstanding as of the date of the designation hereinafter referred to, and issued by a county or defined road district prior to January 2, 1939, in so far as amounts of same were issued and the proceeds actually expended in the construction of roads that have been officially designated as a part of the State Highway System subsequent to January 2, 1939, shall be eligible to participate in the distribution of the moneys coming into said County and Road District Highway Fund as of the date of designation of said road as a part of the State Highway System. The amount of such bonds, warrants, or other legal evidences of indebtedness outstanding as of the date of designation of such road as a part of the State Highway System shall be eligible for participation in the same manner as provided for other bonds under this Act.

"In addition to and regardless of the other provisions of this Act, all bonds, warrants or other legal evidences of indebtedness voted, or issued without being voted by a county, road district or defined road district prior to January 2, 1939, in so far as amounts of same were or may be issued and the proceeds actually expended in the construction of roads which are now a part of the designated System of State Highways or which have since, or which may hereafter become a part of the designated System of State Highways shall be eligible to participate in the distribution of the moneys coming into said County and Road District Highway Fund the same as provided for other bonds under this Act and as of the date of the designation of said road as a part of the State Highway System; * * * " (Emphasis ours)

If House Bill 9 which authorized the issuance of Jefferson County's bonds and declared the intent of the Legislature that they should never be paid by the Board of County and Road District Indebtedness, has been repealed, then the provisions of House Bill 6 might be susceptible of a construction rendering such bonds eligible for participation in that Fund. It becomes necessary, then, to consider the question of whether or not such law has been repealed. House Bill No. 990, RegularSession, 47th Legislature, assumes to repeal House Bill 9. If House Bill 990 correctly expresses theintent of the Legislature to repeal House Bill 9 in any event, we think it is void as being in contravention of the constitutional provision

that no bill, except general appropriation bills, shall contain more than one subject which shall be expressed in its title. Const. Art. 3, Sec. 35. House Bill 990, in such event, assumes to legislate upon two distinct, unrelated subjects, each of which is expressed in the title and in the body of the Act. One subject is the construction of bridges, ferries, tunnels, etc. in counties having a certain population, from one point in the county to another point in the county, and providing that they shall be paid for solely from the revenue derived therefrom. The other subject is the repeal of House Bill No. 9. We see no connection between the two subjects. This being true, House Bill No. 990 would bevoid and wholly ineffectual to repeal House Bill 9. On the other hand, if the Legislature intended to repeal House Bill 9, only in the event of a conflict between the provisions of House Bill 9 and House Bill 990, then the latter bill is ineffectual to repeal the former because there is no conflict. The two treat of altogether different subjects. We are convinced that House Bill 990 does not, in any event, operate as a repeal of House Bill 9. On the other hand, if the Legislature intended to repeal House Bill 9. On the other hand, if the Legislature tended to repeal House Bill 9, only in the event of a conflict between the provisions of House Bill 9 and House Bill 990, then the latter bill is ineffectual to repeal the former because there is no conflict. The two treat of altogether different subjects. We are convinced that House Bill 990 does not, in any event, operate as a repeal of House Bill 9.

Our attention has been called to the repealing clause of House Bill 6, 47th Legislature, First Called Session. It reads as follows:

"This Act shall be cumulative of all other valid laws, but in the event of a conflict between any provisions of this Act and any other Act, either general or special, the provisions of this Act shall prevail."

We think this clause is sufficient to repeal any conflicting provision of any other Act, general or special. (1 Sutherland Stat. Const. (Lewis' 2nd Ed.) Sec. 276, p. 533). It remains to be determined whether there is, in fact, such a conflict between House Bill 6 and House Bill 9 that they may not stand together. An examination of the provisions of House Bill 6 reveals that the first quoted paragraph of Subsection 6a of Section 1 and the last quoted paragraph of the same subsection provide the only terms of the Act whereby the Jefferson County bonds could be eligible for participation. As previously pointed out, Subsection 1 of Section 1 of House Bill 6 reiterates the declaration of the policy of the State in the same terms used in the original Act and all previous amendments thereto. It is a cardinal rule of construction that in order to determine the intent of the Legislature all parts of an Act must be read and construed as a whole. National Surety Corporation v. Ladd, 131 Tex. 295, 115 S. W. (2d) 600; 39 Tex. Jur. Sec. 113, p. 209. Applying this rule, we find that the original act passed by the Legislature in 1932 (Chapter 13, Acts of the Third Called Session of the 42nd Legislature) "took over, acquired, and purchased the interest and equities of the various counties and defined road districts in and to the highways constituting a part" of the then designated State Highways. In each subsequent Acts, including House Bill No. 6, here under consideration, the Legislature has reiterated such acquisition of such interests and equities in such highways, and has declared its intent to take over and acquire the interests and equities of counties and road districts in such state designated

highways as may have been designated subsequent to the time that the original law was passed and prior to the time each respective amendment went into effect. Bearing these facts in mind, we are of the opinion that in the first paragraph of Subsection 6(a) of Section 1, of House Bill 6, when the Legislature speaks of bonds, warrants and other evidences of indebtedness issued by the respective counties and districts, and maturing after January 1, 1933, and actually expended in the construction of roads comprising a part of the system of designated State Highways on September 17, 1932, it had in mind only those enumerated obligations which had been issued by the counties and defined road districts prior to the passage of the original Act, and that as to such obligations it intended to continue the provisions of such original Act in force.

The last paragraph of said Subsection 6(a) stipulates that "in addition to and regardless of the other provisions of this Act" the named legal evidences of indebtedness issued prior to January 2, 1939, and actually expended in the construction of roads "now a part of the designated system of State Highways or which have since or which may hereafter become a part of" such system shall be eligible for participation in the distribution of moneys coming into the County&Road District Highway Fund, "the same as provided for other bonds under this Act and as of the date of designation of said road as a part of the State Highway System." It is obvious that in this provision the Legislature had no thought of including the Jefferson County Bonds as being eligible for participation in such funds. At the date of their issuance, and at the date of the passage of House Bill 9, authorizing their issuance, Highway 87 was a State designated Highway, having been so designated in 1926. Such bonds, obviously, could not participate "as of the date of the designation of said road as a part of the State Highway System." They were not in existence at such date. We believe this paragraph relates only to such bonds or other obligations as were issued for the construction of roads which were not State designated Highways at the time of the issuance of such obligation, but became parts of the System of State Highways subsequent to the voting or issuance of such obligations.

We find no repugnance between the provisions of House Bill 6 and those of House Bill 9. There being no conflict between such provisions, House Bill 6 does not operate to repeal any provision of House Bill 9, and it stands as the clear expression of the Legislative intent with respect to the Jefferson County Bonds. Our conclusion gains support when we consider the facts with reference to House Bill 9. That Act was designed especially for the purpose of authorizing Jefferson County to issue the bonds in question. It was necessitated for the reason that Highway 87 was already a State Highway at the time of its passage. By its terms it specifically provided that Jefferson County should contribute the bonds or the proceeds thereof to the Highway Commission for the construction of a specified bridge, and that upon completion of same such bridge should be the property of the State. The voters of Jefferson County knew the terms of that Act when the bonds were voted. The Legislature could not have been more emphatic in its declaration that Jefferson County could not acquire an "interest" or an "equity" in the bridge by the issuance of such bonds. And it is difficult to see by what stretch of the imagination we might now say that the State is either actually or impliedly, legally or morally obligated to Jefferson County by virtue of the expenditure of such bond issue. We think it clear that there is no such obligation, and that there has never been such an obligation imposed upon the State by reason of the issue and expenditure of these bonds. We think it equally

clear that the State cannot acquire any interest or equity of Jefferson County in Highway 87, by the payment of such bonds. Jefferson County had no interest or equity in such bridge at the time of the voting and issuance of said bonds, and by the very terms of the law authorizing such bond issue could never acquire any. The purpose of the law as declared by the Legislature is to acquire the interest and equities of the several counties and defined road districts. Jefferson County never having had such an interest or equity in Highway 87 by virtue of such bond issue, the State could never acquire or take over any interest or equity by paying off such bonds.

Moreover, we think that when the Legislature authorized the issue of these bonds under the terms and provisions of the Act it authorized a contract between the State and Jefferson County. When Jefferson County issued its bonds and contributed the proceeds of the sale thereof to the Highway Commission it had accepted the offer of contract and had complied with its obligations thereunder. So far as Jefferson County was concerned the contract was complete. When the State, through its Highway Commission, accepted the proceeds of such bonds and constructed the bridge in accordance with the provisions of House Bill 9 the contract had been fully executed as to both parties. Each had fulfilled his obligation, and the people of Jefferson County on the one hand, and the people of the entire State on the other, were justified in considering that all obligations of either party had been fully executed, as between the respective parties to the contract. It was never contemplated by either party that the State should become obligated to Jefferson County for the payment of the amount contributed by Jefferson County. The law upon which such contract was based and by virtue of which it was executed expressly negatives that idea. The people of Jefferson County, by their solemn declaration at the polls, agreed to pay the indebtedness created by such bond issue. The people of Texas are justified in relying on such promise. If we should determine then that the Jefferson County bonds are eligible for participation under the terms of House Bill 6, it would seem that House Bill 6 would be unconstitutional in so far as it permitted such participation in that to such extent it would be a retroactive law impairing the obligation of contracts in contravention of Article 1, Section 16, of the Constitution.

On the other hand, if the fact that both parties acted upon, and carried the terms of the law into execution, each relying upon the acts and declarations of the other did not create a contract between the State and Jefferson County, upon which each party was entitled to rely, we face a still further difficulty in saying that the provisions of House Bill 6 make eligible for participation the Jefferson County bonds. Since, for the reasons already stated, Jefferson County had no interest or equity, and has never acquired any interest or equity in Highway 87 by reason of the issuance of these bonds, and since, for the same reasons, the State owes no obligation, legal or moral to Jefferson County by reason of its contribution of such funds, we are irresistibly drawn to the conclusion that if such bonds should be allowed to participate in the distribution of funds coming into the County and Road District Indebtedness Fund, such participation would be in the nature of a grant of public money to Jefferson County and within the inhibition of Section 51, Article 3, of the Constitution. It is well settled that when a statute is susceptible of two different constructions, one of which would render it valid and the other invalid, that construction which retains the validity of the statute is adopted. Tom Green County v. Moody, 116 Tex. 299, 289 S. W. 391; 9 Tex. Jur. 483. In the Tom

Green County case, supra, the Supreme Court, speaking through Judge Greenwood, said:

" * * * It is clearly our duty to prefer that construction of the statutes which relieves them from attack on grave constitutional grounds rather than to adopt a construction no more definitely required by the language used, which does bring their constitutionality into serious doubt."

While we think it clear that House Bill 6 does not confer eligibility for participation upon the Jefferson County bonds, if the language can be said to be susceptible to the construction sustaining eligibility, we think such construction would raise a grave doubt as to the constitutionality of such Act, and since it is clearly susceptible to the construction we have placed upon it, and since such construction gives effect to the Act as a constitutional measure, we hold that there is no conflict between House Bill 6 and House Bill 9, and that, the described bonds of Jefferson County are not, under the terms of House Bill 6, eligible for participation in the funds of the Board of County and Road District Indebtedness.

We trust that the above fully answers your inquiry.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By /s/ Fowler Roberts
Fowler Roberts
Assistant

APPROVED APR. 14, 1942
/s/ Grover Sellers
FIRST ASSISTANT
ATTORNEY GENERAL

FR:ej:jrb

This Opinion Considered
and Approved in Limited
Conference